ATTORNEY GENERAL, *ex rel.* BROTHERTON, *v.* COMMON COUNCIL OF THE CITY OF DETROIT.

1. MUNICIPAL CORPORATIONS — STREET RAILROADS — HIGHWAYS AND STREETS—PAVEMENT.

The laying of street-railroad tracks in its streets by a city cannot be considered a part of the pavement of the street.

2. SAME—CHARTER POWERS—IMPROVEMENT OF STREETS.

Charter authority to a city to "grade, pave, repair, or *otherwise improve* its streets" does not authorize the laying by the city of street-railroad tracks in its streets for the purpose of leasing them to private persons for operation as a street railroad. BLAIR, MONTGOMERY and MOORE, JJ., dissenting.

Appeal from Wayne; Murphy, Hosmer, Mandell,

Donovan, Rohnert, and Brooke, JJ. Submitted June 13, 1906. (Docket No. 94.) Reargued December 4, 1906. Decided April 30, 1907.

Bill by John E. Bird, attorney general, on the relation of Wilbur Brotherton, against the common council of the city of Detroit, Jacob J. Haarer, commissioner of public works, Francis A. Blades, city controller, and William B. Thompson, city treasurer, to enjoin the construction of street-railway tracks. From a decree for complainant, defendants appeal. Affirmed.

*Isaac N. Payne*, for complainant.

*Bowen, Douglas, Whiting & Murfin* and *Alexis C. Angell*, amici curiae.

*Timothy E. Tarsney*, for defendants.

CARPENTER, J. This suit is brought by the attorney general of the State to prevent the city of Detroit from constructing street-railway tracks in its streets. The sole question involved is this: Has the city authority to construct said tracks? In the court below a hearing was had before all the judges. They were divided in opinion; but a decree was entered granting complainant relief upon the ground that section 9 of article 14 of the Constitution prevented the building of said track. That section reads:

"The State shall not be a party to, nor interested in, any work of internal improvement; nor engaged in carrying on any such work, except (in the improvement of or aiding in the improvement of wagon roads, and) in the expenditure of grants to the State of land or other property."

The above parenthesis is inserted by me for the purpose of this opinion. The clause inclosed therein is an amendment placed in the section in 1905. Prior to that time it read as it would read if the parenthetic clause were omitted.

Is this decision correct?   The question involved is one of great importance.   If the constitutional provision applies, the plans of that large class of people who desire our municipalities to own or operate street railways cannot be carried out under our present Constitution.   If, on the other hand, the constitutional provision does not apply, there is no constitutional objection to any municipality constructing or operating street railways, and there is nothing but a possible lack of legislative authority to empower any of them to engage in that undertaking.   The question of whether municipalities should own or operate street railways is a question upon which wise men differ. It is a question, too, upon which nearly every person has an opinion.   That, however, is not a question submitted to us for decision.   It is a question for the legislative department of government, unless the people have already determined it.   The question for us is:   Have the people determined it ?

Complainant's counsel insist that the authority of the city to construct the track in question may be denied upon two grounds:

*First.* Because the legislature has never granted that authority to the city.

*Second.* Because the constitutional provision before mentioned prevents the legislature granting that authority and the city from exercising it.

The same counsel maintain that it is our duty to deny the authority upon the first ground without considering the second.   It would be our duty to do this if the two propositions presented different questions, but they do not.

In determining the second ( the constitutional ) proposition, we decide just one question which has not already been decided by the harmonious adjudications of this court.   That question is this:  Has the city of Detroit authority to construct street railways under the provision of the Constitution which, by necessary implication, au-

thorizes municipalities to construct and maintain highways for public travel?

In determining the first (the construction of the legislative grant to the municipality) proposition, we decide that the city of Detroit has not authority to construct a street railway under its grant of power to "establish, open, widen, extend, straighten, alter  *  *  *  and to grade, pave, repair and otherwise improve its highways, streets and avenues" (section 169 of Detroit charter), and to keep those highways, streets and avenues "reasonably safe and convenient for public travel." Section 3443, 1 Comp. Laws.

Whether we are construing the legislative grant to the city or the constitutional provision above referred to, we are construing language which has the same meaning, and we reach the same question, viz.: Does the grant of authority to the municipality to construct a highway for public travel authorize it to construct thereon a street railway?

I conclude, therefore, that, if we decide that the legislature has not granted authority to defendant to construct said street railway (and the hypothesis underlying our present argument assumes that we will so decide), it logically follows that said grant was not warranted by the Constitution. In other words, it follows as a necessary consequence of an affirmance by this court of a decree of the lower court that the project of defendant to build a street railway is forbidden by our Constitution. This being so, I can see no impropriety in our so declaring in our opinion; for one of the purposes—indeed the main purpose—in writing that opinion is to enable the profession and the public to apply our decision to future controversies. If, on the other hand, we decide that authority to build a street railway cannot constitutionally be granted, no argument is necessary to prove that the city of Detroit does not possess it. It is true that in deciding the constitutional question above referred to we consider other constitutional questions, but I think it is not improper for us

to do that, because those questions have, as already stated, been heretofore determined by harmonious adjudications of this court. Therefore, without undertaking to determine the construction of the legislative grant, I proceed to consider the constitutional question, viz..: Does section 9 of article 14 of our Constitution prevent our municipalities from constructing street-railway tracks in their streets? I maintain that it does. Respecting this I state three propositions:

*First.* A street railway is a work of internal improvement within the meaning of said section.

*Second.* The prohibition of said section, unless otherwise provided in the Constitution, applies to municipalities which are subdivisions of the State as well as to the State at large.

*Third.* No other provision of the Constitution authorizes a municipality to construct or to operate a street railway.

If I am right in each of these propositions, it is clear that the city of Detroit has no authority to do the proposed work. If I am wrong in any one of them it has that authority. I proceed to consider those propositions.

*First.* A street railway is an internal improvement within the meaning of section 9 of article 14 of the State Constitution. This proposition is conceded by each of the counsel in this case and by each of the learned circuit judges who participated in the decision in the lower court, and by each of the justices of this court. But the decision of an important constitutional question should not rest upon concession alone; and therefore I support the proposition under consideration by other reasoning and authority. While it is not easy to frame a precise definition of the expression, "works of internal improvement" (this question will again be referred to), it is easy to show that a street railway is such a work. The occasion for inserting this language and accompanying prohibition in the Constitution is stated by the opinion of this court written by Justice Moore in *Attorney General* v. *Pingree,* 120

Mich. 550 (46 L. R. A. 407), and it is there made clear that it was designed to cover, among other undertakings, railroads, canals, and similar works. That a street railway is a similar work, and therefore prohibited by the provision, is clear, and is shown in said opinion. It is true that in that case the scheme in question was one of operation; but that the language of the Constitution, "the State shall not be a party to, nor interested in, any work of internal improvement, nor engaged in carrying on any such work," prohibits construction as well as operation, needs no argument or authority; and, if authority be needed, it is found in *Ryerson* v. *Utley*, 16 Mich. 269, where the prohibited work was one of construction, and not of operation. I think this is all that is needed to be said—and perhaps more than is needed in view of the contentions of defendant—in support of the proposition that the scheme under consideration is a work of internal improvement prohibited by the Constitution.

*Second.* The constitutional provision in question, except as otherwise provided in the Constitution, prohibits municipalities, as well as the State at large, from engaging in works of internal improvement. In *People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich. 499, this court decided, as stated by Justice MOORE in *Attorney General* v. *Pingree,* supra, " that the construction of a railroad was an internal improvement within the meaning of the Constitution, and that what the State could not do it could not authorize the townships and cities to do." The same proposition was decided in *Thomas* v. *City of Port Huron,* 27 Mich. 320, and *Attorney General* v. *Pingree,* supra. See, also, *Anderson* v. *Hill,* 54 Mich. 477. It is true that this proposition was denied by the Supreme Court of the United States in *Township of Pine Grove* v. *Talcott,* 19 Wall. (U. S.) 666, and *Taylor* v. *Ypsilanti,* 105 U. S. 60, but notwithstanding that denial this court deliberately chose, in *Dodge* v. *Van Buren Circuit Judge,* 118 Mich. 189, to stand by its position. We cannot at this day deny that proposition without

overruling those decisions. Of course, we have the power to overrule them; but this power should not be exercised unless we are clearly convinced that those decisions are wrong. I, for one, am not so convinced. Study and reflection have strengthened my conviction that they were properly decided.

In determining the meaning of the provision in question, we should remember that we are construing a Constitution. It should be given the meaning that the people intended it should have. It should be construed, if its language is appropriate, so that it will accomplish the purpose the people intended it to accomplish. What was that purpose? This cannot better be stated than by quoting the languge of Justice COOLEY in *People, ex rel. Bay City*, v. *State Treasurer*, supra:

"Our State once before had a bitter experience of the evils of the government connecting itself with works of internal improvement. In time of inflation and imagined prosperity, the State had contracted a large debt for the construction of a system of railroads, and the people were oppressed with heavy taxation in consequence. Moreover, for a portion of this debt, they had not received what they bargained for, and they did not recognize their legal or moral obligation to pay it. The good name and fame of the State suffered in consequence. The result of it all was that a settled conviction fastened itself upon the minds of our people, that works of internal improvement should be private enterprises; that it was not within the proper province of government to connect itself with their construction or management, and that an imperative State policy demanded that no more burden should be imposed upon the people by State authority for any such purpose."

It follows that the purpose of the constitutional prohibition was to protect the people—not merely one of their governmental agencies—from the consequences (supposed evil consequences) resulting from governmental connection with the construction or management of works of internal improvement. This purpose is completely frustrated if cities, villages, and townships by authority of the

central government engage in such work. In that case subdivisions of the State by authority of the State are engaged in works of internal improvement, and the evils of that engagement, if evils they are, are quite as burdensome on the people as if the central government itself had engaged in such work. To be effectual, the constitutional prohibition—and it was intended to be effectual and must be so construed—applies to every part of the State, and to me it seems absurd to suppose that the people intended to permit a part of the State to do what the whole State could not do. It is not to be supposed that the people in adopting this provision intended to prohibit the whole State from engaging in works of internal improvement and at the same time to permit any part of the State to engage in them; for, if each community can through its local government engage in such work, the consequences to the people are precisely the same as though the State engaged in it. The burden upon the people is quite as onerous and the extent of the possible undertakings is almost as great. This is shown by an illustration suggested by the present case. A similar illustration was used by Justice MOORE in his opinion in *Attorney General* v. *Pingree*, supra. If cities, villages, and townships may construct street railways, certainly they may construct those street railways which have proved to be best and most efficient, and those in rural localities at least extend through many municipalities and transport passengers and freight between distant communities. Though in such a case each municipality may for constitutional reasons other than that under consideration be prohibited from constructing or operating a road outside of its own geographical limits, the road within those limits may nevertheless be only a part of some system greater and more extensive than any dreamed of at the time our Constitution was adopted. This illustration is used, not because its magnitude determines whether a given undertaking is or is not a work of internal improvement (for the contrary is clear and is well settled; see *People, ex rel. Hubbard*, v. *Township*

*Board of Springwells*, 25 Mich. 153), but to show more clearly that the constitutional prohibition would become a dead letter if it has no application to municipalities. It follows from these decisions and this reasoning that the constitutional provision under consideration prohibits the State from granting to municipalities authority to engage in works of internal improvement.

It is argued, however, that, though the State cannot authorize municipalities to engage in *all* works of internal improvement, it can authorize them to engage in certain of said works, viz., those which are local in character. If there is any ground for this distinction, it must be found in the Constitution. If a prohibitory constitutional provision, general in its character, is subject to exceptions, those exceptions must be found in the Constitution. The courts cannot create them. They can only declare the exceptions which the Constitution itself creates. Every work of internal improvement described in the provision under consideration is prohibited, unless it is excepted by the Constitution. A municipality cannot therefore engage in any such work unless it is authorized to do so by some other provision of the Constitution. In other words, the constitutional prohibition under consideration, except as otherwise provided in the Constitution, applies to municipalities as well as to the State. In the addition to his opinion, Justice BLAIR contends that the constitutional provision applies to municipalities only when they are "acting as agents of and for the State." While I think this contention is answered by the foregoing reasoning, I deem it proper to add that, in my judgment, it is opposed to the decisions of *Attorney General* v. *Pingree*, 120 Mich. 550 (46 L. R. A. 407), and *People, ex rel. Bay City*, v. *State Treasurer*, 23 Mich. 499, and to the reasoning upon which those decisions are based.

It is suggested that our decisions, made before the recent amendment of 1905 permitting the State to improve or aid in the improvement of public wagon roads, holding a road for the purpose of public travel to be a work which

municipalities can construct or maintain, though it is, as to the State (see *People, ex rel. Hubbard,* v. *Township Board of Springwells,* 25 Mich. 153), a prohibited work of internal improvement, proceed upon a principle opposed to the foregoing reasoning. This I deny. On the contrary, I assert that those decisions afford an instance of the application of that reasoning. Municipalities could construct and maintain roads for public travel, though such roads were, prior to the recent amendment of 1905 above referred to, works of internal improvement prohibited by the Constitution, not because of any exception found outside the Constitution, but because other provisions of the Constitution (article 11, § 1. See, also, article 4, § 49; article 10, § 11) by necessary implication granted municipalities authority to construct and maintain such roads. Though cities and villages are not expressly named in the foregoing sections, I think it settled by our decisions (*Moreland* v. *Millen,* 126 Mich. 381, and authorities there cited) that they have the same constitutional right of control over highways as are given by the above sections to the townships therein named. In the addition to his opinion, Justice BLAIR denies the foregoing proposition, and says:

" Nowhere has the Constitution granted to cities, either expressly or by necessary implication, authority to construct or maintain highways. * * * They possess that power, if they possess it at all, because the Constitution nowhere prohibits its exercise, and the legislature has granted it."

I deem it a sufficient rejoinder to say that the right of a city to construct and maintain its highways is one of its rights of local self-government which this court has held is a constitutional right. I think this is the holding of the entire court in *Moreland* v. *Millen,* supra. It is entirely consistent to say that, though municipalities were prohibited by the Constitution from engaging in works of internal improvement, they might nevertheless construct and maintain roads—which are works of internal improvement

—because the Constitution empowered them to do so. The constitutional prohibition was to be read as if the construction and maintenance of roads for public travel by municipalities were excepted from its operation.

We may then conclude this part of the opinion by saying that, as a street railway is a work of internal improvement within the meaning of the constitutional prohibition under consideration, a municipality cannot construct it or operate it, unless authorized to do so by some other provision of the Constitution.

*Third.* This brings us to the third proposition in this opinion, viz., no other provision of the Constitution authorizes municipalities to construct or to operate street railways. It is contended that the constitutional grant of authority to construct and maintain roads for public travel carries as an incident thereto authority to construct street railways upon said roads. Is this contention sound? This raises the most important question in this case; and it is, as heretofore stated, the only constitutional question not heretofore determined by this court. We are not materially assisted to a correct answer of this question by determining whether or not the tracks of a street railway, after their construction, are a part of the road adapted to ordinary public travel. The question in this case is not whether municipalities can construct street railways for the purpose of being used for ordinary public travel. The bill of complaint shows that the street railways under consideration are not to be constructed for that purpose. They are, when constructed, to be used like all street railways, viz., for transporting thereon passengers for hire. While the city of Detroit does not itself propose to directly engage in such transportation business, it does propose to obtain the profits of that business. Indeed, the securing of those profits is not only *an essential,* but it is *the essential,* part of defendant's project. To sustain defendant's right to construct a street railway and to deny defendant's right to the profits of the use of that railway is

to give it a stone when it asks for bread. Unless a municipality can secure such profit, municipal construction of street railways would be an utter waste of public funds, and for that reason will never be undertaken and should never be permitted. If, then, there is an objection to municipalities securing the profit of transporting passengers for hire upon street railways constructed by them, that objection is fatal to the project of the city of Detroit under consideration, as well as to all similar projects of construction. Can a municipality secure the profit of transporting passengers for hire upon street railways constructed by them? If we concede its right to secure those profits, we must also concede to it the right to choose the method by which it will secure them. If it can best secure those profits by leasing said street railways, it may lease them. If it can best secure those profits by operating said railways, it may operate them. There is undoubtedly a great difference between municipal ownership and municipal operation of street railways; but there is no constitutional objection to municipal operation which does not apply to municipal ownership. If the prohibition, "The State shall not be a party to, nor interested in, any work of internal improvement, nor engaged in carrying on any such work," does not prevent a municipality constructing and leasing a street railway, it does not prevent a municipality operating said railway. Does the constitutional grant of authority to construct and maintain roads authorize a municipality to secure to itself the profits of transporting passengers for hire upon a street railway constructed on said roads?

The grant of authority to construct and maintain a road is unquestionably an extensive one. It confers authority to do whatever is necessary to make and adapt that road to public travel. It cannot be claimed, however, that there passes as an incident to such grant authority to transport passengers for hire upon said road or upon any part of said road; otherwise municipalities could engage in running stage lines, omnibus lines, or hack lines upon

their highways. Authority to construct and maintain highways and authority to transport passengers for hire upon said highways are in their nature and have been in practice radically distinct. The latter authority does not pass as an incident to the grant of the former. This disposes of the contention that defendant acquired power to execute its project as an incident to the grant of authority to construct and maintain roads; for defendant cannot execute that project—e. g., secure the profits of transporting passengers for hire upon the street railways constructed by it—without engaging directly or indirectly in the business of transporting passengers for hire. The proposition that the grant of authority to municipalities to construct and maintain highways carries the incidental authority of constructing and operating directly or indirectly street railways for the transportation of passengers for hire on said highways would defeat the purpose for which the constitutional provision prohibiting works of internal improvement was adopted. It has already been shown in this opinion that the paramount purpose of the people in adopting this provision was to prevent the government (either state or municipal) engaging itself, directly or indirectly, with schemes for transporting passengers for hire. The distinction between such undertakings and that of building roads upon which such passengers were transported was presumably as obvious then as it is now; and, when the framers of the Constitution gave to municipalities authority to construct and maintain roads, it cannot be presumed that they intended them (said municipalities) to engage in undertakings which experience had shown to be disastrous and which they intended to prohibit.

I think it may help to a clearer understanding if I state what I concede to be the essential difference between Justice BLAIR and myself respecting the foregoing vital question. It is this, viz.: He denies our right to consider the purpose and design of a street railway in determining whether or not its construction is a legitimate highway improvement; while, on the contrary, I affirm

that we should consider its purpose and design, and that they prove that from its very inception it is not a legitimate highway improvement.

It is suggested that section 38 of article 4 of the State Constitution, authorizing the legislature to confer upon townships and incorporated cities and villages "such powers of a local, legislative and administrative character as they may deem proper" has some bearing upon the proposition under discussion. I answer this by saying: The constitutional provision that the State—and this provision, as we have seen, extends to municipalities created by the State—shall not engage in works of internal improvement is a limitation upon the authority of the legislature when acting under this section. The legislature, when so acting, has no more right to disregard the prohibition against internal improvements than it has to disregard the provisions securing the right of trial by jury, or any other fundamental constitutional limitation upon its authority; and this principle was recognized and applied in *People, ex rel. Bolt*, v. *Riordan*, 73 Mich. 508. I am referred to, and can find, no other provision of the Constitution which authorizes municipalities to construct or to operate street railways. I therefore conclude there is none.

It is said that in *City of Detroit* v. *Railway*, 133 Mich. 608, and later in 134 Mich. 11, we passed upon this question and determined that the city of Detroit has authority to construct a street railway. In the first case it appears that the city had entered into an agreement which obligated it to maintain the pavement of a street and the foundation upon which it rested, which foundation was also the foundation upon which the track of a street railway rested.

"Some spots adjacent to its [the street-railway track] tracks became in bad condition, the pavement disintegrated and destroyed, and the foundation under the rails in places settled, allowing the rails to settle, due to the use of the track. The railway company having refused

to repair the foundation and pavement, this [mandamus] proceeding was instituted."

It was insisted that the city could not be compelled to do this work, because it was a prohibited work of internal improvement under the constitutional provision in question. We decided otherwise, saying:

"The street-railway law does not in any way relieve the municipalities from the responsibility of maintaining the highways in a reasonably safe condition for public travel, and, as it cannot shift its liability to a railway company by contracting with it for the maintenance of the way, it would seem that it should be authorized, if it is not under legal obligation, to repair the way when out of repair, whatever the cause. * * * Street railways are adapted to aid travel in public highways, and, while the laws providing for their use impose upon private corporations the burden of constructing and operating them, all such laws contemplate that they will be constructed upon the highway. They presuppose a highway maintained by the public; and we are of the opinion that it is not beyond the authority of the public officers to build a highway that will support such traffic, even though it need a heavier pavement than ordinary traffic requires. We are also of the opinion that it cannot be said that the city engages in a work of internal improvement by making a contract whereby it shall construct and repair its highways and pavements instead of allowing the railway company to interfere with them."

By this same reasoning we enforced in the second of those cases (*City of Detroit* v. *Railway*, 134 Mich. 11) the agreement of the city to pay for constructing the concrete foundations of a street-railway track on unpaved streets.

It is said that we have held in these cases that a city may construct the foundations for a street-car track, and that it is absurd to deny that it may construct on said foundations the tracks for which they are intended. This is plausible reasoning; but plausible reasoning is not always sound reasoning. It conveys an erroneous impression to say that we have decided that a city may construct the foundations for street-railway tracks. The

statement implies that we have held that it may construct those foundations under all circumstances. The utmost that can be said is that we have held that it may construct them under certain particular circumstances. To be exact it should be stated that we have decided that a city may construct the foundations of street-railway tracks when those foundations are also the foundations upon which rests the surface of a street which it (the city) is bound to maintain in a condition reasonably safe for public travel; and we have *never* held that it may construct foundations whose sole function was to furnish a roadbed for the rails. In other words, we have decided that the existence of a street railway upon a street in no way impairs the right or duty of a city to keep and maintain that street in a condition reasonably safe and fit for public travel, and that it may do or contract to do whatever is necessary to be done to perform this obligation. We upheld the city's agreement in those cases to construct the foundation of a street railway, not because it was the foundation of a street railway, but because there rested upon it a surface which it (the city) was bound to maintain in proper condition for travel. We had no occasion in those cases to determine, and did not determine, the right of a municipality to construct any other part of a street railway than that which had relation to the municipal obligation to maintain a street for ordinary traffic. In those cases the question was not the one involved here, viz., can a municipality construct a street railway to be used as a street railway for the purpose of transporting passengers for hire? but it was this, viz., is the obligation of a municipality to maintain its streets in proper condition for ordinary traffic lessened by the circumstance that it rests upon a foundation which is also the foundation of a street railway? In this latter case it can very truly be said that without maintaining the foundation the city could not maintain the surface which rested upon it; that without maintaining the foundation the city could not provide a reasonably safe street for public travel; and we held, and

in my judgment properly held, that this reasoning was just as applicable to an unpaved as to a paved street. Would any one venture to say that a city cannot discharge its duty of providing a safe street for ordinary public travel without putting upon that foundation a street-railway track and leasing the same for the transportation of passengers for hire? That is a very different proposition. It is the proposition involved in this case; and its determination, as we have shown in this opinion, depends on very different reasoning, reasoning which results in a very different conclusion.

It is also contended that, if we deny the right of a municipality to construct a street-railway system because it is a work of internal improvement, we must by the same reasoning deny its right to construct and maintain parks, waterworks, sewers, and a public lighting system. We answer this contention by saying that the right exercised in these latter instances is not prohibited by the constitutional provision under consideration. Those undertakings are not works of internal improvement within the meaning of the constitutional provision. One of the grounds upon which the right of a city to construct and maintain parks, waterworks, and sewers is that those undertakings contribute to the public health. 2 Dillon on Municipal Corporations (4th Ed.), § 598. A municipality may maintain a public lighting system because it tends to the suppression of crime and the safety of travelers upon municipal highways.

That there is a constitutional distinction between such undertakings and the construction of a street railway is shown by our own decisions. We have held that straightening or deepening the channel of a stream for the purpose of reclaiming submerged lands (*Anderson* v. *Hill*, 54 Mich. 477; *Wilcox* v. *Paddock*, 65 Mich. 23), or for the purpose of improving the navigability of the stream (*Ryerson* v. *Utley*, 16 Mich. 269), is a work of internal improvement within the meaning of the Constitution; but, if it is straightened or deepened for the

purpose of promoting public health, it is not a work of internal improvement within the meaning of the Constitution (*Brady* v. *Hayward*, 114 Mich. 326). Undertakings in the performance of what has always been regarded as a duty owed by a government to its citizens, like that of protecting their health or suppressing crime, have never been considered and are not properly denominated works of internal improvement. In this connection it is proper to observe that the furnishing of transportation facilities has not always been regarded the duty of a government. The question naturally arises: Why is a street railway a work of internal improvement and a sewer not a work of internal improvement? While it is sufficient to show that the authorities recognize the distinction between them, it would be more satisfactory if a reason for that distinction could be pointed out. This I shall attempt to do. All will agree that at the time our Constitution was adopted, undertakings by the government to construct artificial highways of commerce or to improve natural highways of commerce were called works of internal improvement. Indeed, the expression, " works of internal improvement," was applied to undertakings of this nature carried on by the national government very early in its history.

It is therefore clear that our Constitution was intended to and does prohibit all such undertakings ( though the recent amendment excepts improvement of public wagon roads from the prohibition ), and this obviously, as before stated, prohibits the construction of a street railway. If we can determine just why governmental undertakings to construct artificial highways of commerce or to improve natural highways of commerce were called works of internal improvement, we will, I think, understand why a sewer and other similar works are not works of internal improvement. I suggest that the service they render and the resulting consequences indicate why they were called works of internal improvement. Highways of commerce, whether natural or artificial, by facilitating and cheapen-

ing transportation, gave the localities through which they run material advantages which they did not theretofore have; (and this was especially true in the early days of our country). They increased the value of the land whose products they carried to market, and, as they were located within the limits of the country, they did in the broadest, though in a material, sense improve its interior. They were works of internal improvement because they improved the interior of the country. While those who advocated great national expenditures in these undertakings found legal justification therefor in the constitutional grant of authority to Congress [Art. 1, § 8] "to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States" (2 Story on the Constitution [5th Ed.], § 1273), the moral justification was that they enhanced our material prosperity. Had they not in a material sense improved the country's interior, their undertaking lacked justification. They were therefore works of internal improvement. They are easily distinguished from such undertakings as the construction of parks, sewers, waterworks, and a system of public lighting. If these latter undertakings add or tend to add to the material prosperity of the community in which they are located, and doubtless they sometimes do so add, that is obviously neither the legal nor the moral purpose for which they were undertaken. Indeed, it may be said of them that if they did not in the least contribute to the improvement of the interior, and many times they do not so contribute, they would none the less be undertaken. The function of each of these latter undertakings is governmental in its character. In short, the difference between these two classes of undertakings is this, viz. : The function of one is to improve the interior, and the function of the other is not to improve the interior, but it is to perform what has always been regarded as a duty owed by the government to its citizens. Hence the one are works of internal improvement and the other are not works of internal improvement.

The eminent counsel for defendants has eloquently pictured to us the advantages which will accrue to the people of the city of Detroit if their local government is permitted to engage in this work of internal improvement —this proposed construction of a street railway. He may be right. It may be that engaging in that undertaking will be attended by no evil consequences and by great advantages to the people. That question is not for our determination. We can only say that those who adopted the Constitution, being of the opinion that the best interests of the people would thereby be promoted, prohibited such undertakings; and, so long as the Constitution contains that prohibition, we must enforce it.

I am therefore of the opinion that the city of Detroit has no authority to carry out its project of constructing a street railway.

The decree should be affirmed.

McALVAY, C. J., and HOOKER, J., concurred with CARPENTER, J.

GRANT, J. The allegations in the bill of complaint and the ordinance of the city, which is the subject of this litigation, are fully stated in the opinion of my Brothers BLAIR and OSTRANDER, and a further statement is unnecessary. I agree with them that by no stretch of construction can the laying of steel rails in the streets of a municipality for leasing to private parties be considered a part of the pavement of the street. No stretch of imagination, in my opinion, would permit any other conclusion. Street-car tracks injure rather than aid the pavement of streets, and obstruct rather than aid the passage of vehicles entitled to the free use of the streets from curb to curb. The learned counsel for the respondent state their claim as follows:

" What we seek to do is to construct streets; that is all. And in paving those streets we propose to use just such material as, in the judgment of the common council, is adequate and proper and necessary to meet the growing

demands of that great city. And we propose to make, as a part of that pavement, two streaks of steel, or four streaks of steel, as the case may be, so that when it is constructed we will have a pavement with a solid foundation of adamant in the form of concrete. It may be paved from the curb line to near the center with brick or asphalt, and then in the center of that street and as a part of that pavement we propose to lay steel rails, level with the balance of the pavement, and, when it is done, it is a street, constructed under the powers conferred by the Constitution of the State and of the charter of the city of Detroit."

In *Reg.* v. *Train,* 9 Cox. Crim. Cas. 180, the local authorities permitted a private party to construct a tramway for the convenience of the carriage of passengers in the streets of the city. It was attempted there to maintain the tramway as a part of the pavement. Of this claim the court say:

"It seems almost ludicrous to say that making a tramway of this kind was a mode of paving."

Inasmuch as we all agree that the proposed tracks cannot be laid as a pavement, the only other theory under which the ordinance could be maintained is that it is an improvement authorized by that provision of the charter conferring upon the common council "the power to grade, pave, repair or *otherwise improve* the streets." It is the universal rule that municipalities derive their powers from the legislature; that they possess no inherent powers in and of themselves; that those powers must be either express or necessarily implied; and that in order to imply them they must be essential to the exercise of the function under which the municipality is acting. These powers cannot be extended by construction, but must be strictly construed. *Taylor* v. *Railway Co.,* 80 Mich. 77; *Farr* v. *City of Grand Rapids,* 112 Mich. 99; *Detroit Citizens' St. R. Co.* v. *City of Detroit,* 110 Mich. 384; 1 Dillon on Municipal Corporations (4th Ed.), § 89. See, also, the authorities cited in those cases. It is unnecessary to multiply authorities, which might be done to an almost unlimited extent. It must be conceded that no

express power to lay railroad tracks in the streets of the city of Detroit is conferred by the charter. It must also be conceded that there is no language in the charter to justify a conclusion that the city was authorized to construct, own, and maintain a system of street railways, or to construct any part thereof. It is sought to imply this power to construct "street railway tracks, loops and connections" from those innocent words "*otherwise improve.*" Is it reasonable to suppose that the legislature intended to confer this power to impose taxes upon the people of that city, not for the general use of the public, but for leasing to a private corporation for the purposes of revenue, should the common council be able to effect a contract with some private corporation ? Eight years ago there were in the city of Detroit 141 miles of street railway in active use, and 179 miles, including abandoned tracks and car barn tracks. *Attorney General* v. *Pingree*, 120 Mich. 568 (46 L. R. A. 407). Undoubtedly many more miles have been added since. If the city possesses the power to lay these tracks as a part of the street structure, for the same reason it has a right to purchase those already laid from the company or companies owning them. The right to construct necessarily implies the right to purchase. What the expense to the city would be we cannot ascertain from the pleadings in the case. Certainly it would be enormous. I find from the present market quotations that the steel rails alone would cost per mile between $4,500 and $5,000. At these figures the cost of the rails alone for 200 miles of track would be nearly or quite $1,000,000. This is by no means all the cost. This does not include ties, switches, frogs, and other things, or the cost of laying the tracks. Such power of taxation can only rest upon express authority or absolute necessity. Neither, in my opinion, exists in this case.

Probably similar language to that in the Detroit charter is found in nearly all the municipal charters of the State. The legislature, probably in all the cities, as it does in the

general law, authorizes and empowers the common councils of these municipal corporations to permit railroad corporations to lay tracks and operate their roads in the public highway upon such terms and conditions as the council may prescribe. 1 Comp. Laws, § 3111. What the city of Detroit may do under its charter any other municipal corporation can do under similar language. It would follow, therefore, that the legislature has impliedly authorized the expenditure of millions of dollars in buying steel rails and building superstructures, not as a pavement, but as an improvement to the streets and highways, not for the general use of the public, but for the exclusive use of private parties and their patrons. I cannot yield my assent to that doctrine. It would follow that adjoining municipalities may, without the vote of the people, tax the citizens for the construction of such superstructures, and lease them, if they can make a satisfactory arrangement, to private corporations. It is easy to see how promoters of these railways, by the usual specious arguments of benefits, may induce common councils to lay tracks and lease them for perhaps a mere nominal sum. The history of the granting of street-railway franchises in this State, often without compensation, shows how ready people often are to vote away franchises without any adequate compensation. In this way one company might lease the tracks in Detroit, and in every municipality adjoining Detroit and beyond. I can find nothing in the charter of the city from which so important and dangerous a power can be implied. For these reasons, I concur in the opinion of my Brother OSTRANDER.

2. Having determined that the ordinance can only be sustained upon the basis of a public improvement, we come to the question: Is it a part of an internal improvement prohibited by the constitutional provision? Article 14, § 9. It is not proposed to construct these tracks for the general use of the public. Counsel for the city disclaim any intention on the part of the city to construct, own, and operate a street railway. They are to be con-

structed for no other purpose than to lease to some private corporation. They are to be a part of the street railway owned by the city, while the other. parts are owned by some private party. The ordinance so expressly states. It cannot, therefore, be devoted to public use in any sense, unless the common council can make a contract to lease it to some person or corporation; and there is no claim that they now have a contract for such lease.

The track is not laid for the use of the general public, but only for those who choose to ride on the cars of a private corporation. It cannot be used in any other way. One individual or corporation must have the sole right to use these tracks for the transportation of passengers and as well of freight, for it is a matter of common knowledge that frieght is now being carried over them into the heart of the city. The ordinance itself does not pretend to say that it is an improvement to the street as a part of the structure of the street. It purports on its face, and was evidently so intended, to present the question whether the city had the right to construct a part of the equipment of a street railway. If it may buy the rails and ties and lay the tracks, it may as well erect the steel trolley poles, which are also in the street, and are as permanently attached to it as are the rails. The improvements to streets and highways contemplated by the Constitution and the statute are ejusdem generis, and intended for the use of the general public. They do not include those things not owned by the public, but by private corporations, which municipalities under their charters may authorize private corporations to place in the streets for the purpose of carrying passengers and freight for profit. They are not improvements intended for the common use of all travelers having occasion to use the streets. They are improvements for revenue to be derived from leasing to private parties.

The fact that street cars are held not to be an additional servitude to the street is of no significance, in my opinion, in considering this question. The State through its

municipality may permit the use of carriages to run upon rails or upon the pavement, without creating any additional servitude. Grant that street railways have become essential in the business of our large cities; yet that fact does not make any part of the equipment of such railway a public improvement to the street like a macadamized roadbed, or a brick, stone, or asphalt pavement. The rails and ties are not a part of the roadbed. They are the superstructure upon the roadbed.

"Rails in place constitute the superstructure resting upon the roadbed." *San Francisco, etc., R. Co.* v. *State Board of Equalization,* 60 Cal. 34.

Trucks as heavy as a street car, and engines of immense weight, now pass over our streets and highways. The municipality may construct pavements deep enough and strong enough to support these heavily loaded trucks. So far as the duty and power to construct pavements of sufficient strength to sustain them are concerned, it cannot make any difference whether such carriages run upon rails or without. Constructing a pavement or roadbed of sufficient strength to sustain the weight of street cars and rails upon which they are run is no different in principle from constructing a portion of a street of sufficient strength to bear heavy loads drawn over them without rails, while another part of the street may contain a lighter pavement, designed for lighter loads and vehicles. It would, I assume, be entirely proper for a municipality to construct one side of the street for heavy vehicles, and the other for light vehicles, and compel vehicles of a certain size, weight, and character to be hauled over certain parts of the street. But an entirely different question would arise when one corporation or individual desired to use a portion of that street upon which to lay tracks to carry his heavy loads, instead of hauling them upon the pavement. The difference between laying a pavement or roadbed of sufficient strength to bear any and all vehicles which may pass over it, and the construction, upon the surface of the street, of a part of the equipment for the operation of a

street railway, is so great that I am unable to see any resemblance between the two.   The case of *City of Detroit* v. *Railway*, supra, only holds that the common council may construct a pavement of sufficient strength to sustain the superstructures of a street railway and the vehicles running over it.   That was the sole question in the case. We said:

"Street railways are adapted to aid travel in the public highways, and, while the laws providing for their use impose upon private corporations the burden of constructing and operating them, all such laws contemplate that they will be constructed upon the highway.   They presuppose a highway maintained by the public, and we are of the opinion that it is not beyond the authority of the public officers to build a highway that will support such traffic, even though it need a heavier pavement than ordinary traffic requires.   We are also of the opinion that it cannot be said that the city engages in a work of internal improvement by making a contract whereby it shall construct and repair its highways and pavements, instead of allowing the railway company to interfere with them."

I participated in that decision, and never for a moment supposed that I was sustaining a proposition which would authorize the city to construct the superstructure or any part of the equipment of the street railway.   If any such conclusion can legitimately be drawn from that decision, it should be promptly overruled.   The power of the legislature to authorize the construction of railroads in its streets and highways by private corporations or individuals has never been questioned.   We are confronted now for the first time with the proposition that the State through its municipalities may assist the construction of railways by building the superstructure, a large part of the cost, at the expense of the public, upon the idea that they can be leased to a street-railway corporation for profit.

In *Kirkland* v. *Board of Public Works of Indianapolis*, 142 Ind. 123, the charter provided that street improvements should be assessed against abutting lands per

running foot front, without regard to benefits; that sewers should be assessed, in certain cases, according to benefits, etc. The board of public works adopted a resolution for improving a certain street "by grading, curbing and paving the roadway with brick on concrete foundation, and constructing drains or sewers and appurtenances thereto, according to drawings," etc. The question arose whether the drain was a part of the public improvement of the street. It was not intended as a sewer for the use of abutting owners, but as a drain for the street. It was held to come within the meaning of the term "improvement." If the drain was essential to the proper construction of the street, it was a part of the pavement. If the case held, which I think it does not, that a sewer could be constructed under provisions similar to those in this case, it would be in conflict with *Peck* v. *City of Grand Rapids*, 125 Mich. 416.

In *Thompson* v. *City of Highland Park*, 187 Ill. 265, the sole question was whether in grading and paving a wide street the city was authorized to grade the street on two sides and leave a space in the center to be covered with loam and seeded with grass seed, and planted with trees, 50 feet apart. The improvement contemplated was a benefit to the entire public. It was not for a lease to private individuals or private corporations. It was such an improvement as cities from time immemorial under general language have been in the habit of making. It does not apply to a railroad track laid in a public highway for the benefit of private parties, although its use is quasi public and involves relief upon the highway in transportation of passengers. I find nothing in those and similar cases to sustain the proposition now contended for. We are cited to no authority holding that the superstructure of a railway is an essential part of the structure of a street, and may be therefore constructed at public expense. Our conclusion is that it is a necessary part of the equipment of a street railway.

The conclusion that this superstructure is a part of a
street railway brings us necessarily to the question: Is a
street railway, wholly within the corporate limits of a
city, an internal improvement prohibited by the Constitu-
tion ?   We might avoid this question by the concession
of counsel that the respondents do not contemplate the
ownership and operation of a street-railway system.   We
avoided the question in *Attorney General* v. *Pingree,*
120 Mich. 550 (46 L. R. A. 407), for the reason that it
was not absolutely necessary to the decision of that case.
The question is now properly before us; and it is justice
to the parties interested and to the public that it be deter-
mined.   We are also constrained to dispose of it because,
should it be held that this superstructure can be laid as a
part of the structure of a street, it might be regarded as
another step towards holding that a municipality may
both construct, own, and operate a street railway, just as
it is now argued that we took a similar step in *City of
Detroit* v. *Railway,* supra.   We think the language in
*Attorney General* v. *Pingree* decides the question.   We
there said:

"To say the system of railroads as it existed in 1850
constituted internal improvements, within the meaning
of the Constitution, and that the system of roads existing
in Detroit, which are to be taken over by this commission,
and the lines leading thereto, with which said commission
are allowed to make agreements for deeds, leases, and in
relation to the exchange of tickets and transfers, is not a
system of internal improvements within the meaning of
the Constitution, is to deny to words in common use their
ordinary and accepted meaning.   If the legislature may
authorize the city of Detroit to enter into the proposed
arrangement, it may authorize any other municipality to
do so, and, by concert of action between the various
municipalities, they may cover the State with means of
rapid transit, owned and operated by the municipalities.
This would enable the State to do, by means of agencies
called into being by itself, what it cannot itself do, and
what the Constitution forbids it doing."

The experience of the people of Michigan, prior to the

adoption of the present Constitution, in making, owning, and operating internal improvements (railroads and canals), has been a subject of historical and judicial investigation. The question has been fully covered both historically and judicially, and I deem it unimportant to again review the subject. *People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich. 499; *People* v. *Township Board of Salem,* 20 Mich. 478; *Thomas* v. *City of Port Huron,* 27 Mich. 320; *Dodge* v. *Van Buren Circuit Judge,* 118 Mich. 189; *Anderson* v. *Hill,* 54 Mich. 477; *Ryerson* v. *Utley,* 16 Mich. 269; *Sparrow* v. *Commissioner of State Land Office,* 56 Mich. 574.

In other cases than those above cited the people of various localities in this State, impressed with the idea that the construction of railroads or the existence of manufacturing establishments in the locality justified the expenditure of public funds as a bonus, have freely voted them, and the courts have universally set them aside. Often failure has resulted and the debts have been repudiated. See *Common Council of Cedar Springs* v. *Schlich,* 81 Mich. 405 (8 L. R. A. 851); *Board of Sup'rs of Cheboygan Co.* v. *Township of Mentor,* 94 Mich. 386; *Schmid* v. *Village of Frankfort,* 131 Mich. 197.

What is the distinction between a steam railway and a street railway? Both are organized for and engaged in the same kind of business, to wit, the carriage of passengers, and now both are engaged in carrying freight. One obtains its right of way by purchase or condemnation, the other obtains its right of way from the State through the municipality, usually upon such terms and conditions as the municipality may direct. Both are quasi public corporations. Both are equally doing a private business for gain. Both are equally internal improvements within the language above quoted in *Attorney General* v. *Pingree.*

The question of what is an internal improvement does not depend upon its extent or size. A canal or a railway a mile long is just as certainly an internal improvement

prohibited by the Constitution as one 50 or 100 miles in length. The character of the work determines the question. This clause of the Constitution was adopted for the purpose of absolutely preventing the State as a unit, or any of its agencies, the municipal corporations, or the people thereof, from in any way engaging in these internal improvements. If within five years after the adoption of that Constitution the common council of the city of Detroit had concluded to construct the superstructure of a street railway consisting of its ties, rails, etc., for the purpose either of owning or operating a street railway itself, or for leasing it to some private party, is it possible the courts would then have held that such street railway was not an internal improvement prohibited by the Constitution? But the learned counsel for the city say:

"It is the exigencies of the times that demand these new methods of conveyance."

Conditions, the ideas, and wishes of the people may change, but Constitutions do not. What they mean when adopted they mean forever, unless changed by amendment. No exigency changes rules of construction. Should the people subsequently desire a different Constitution, the Constitution itself provides a speedy way in which its provisions can be amended or abrogated. Until that is done, the Constitution is the pole star for legislative enactment and judicial construction.

The power to construct railways cannot be justified under the police power inherent in the people for the protection of their lives, health, persons, and property. The distinction is apparent, and I will not enter upon a discussion of it.

Neither will I attempt a definition of the term "internal improvement," or discuss what improvements may be excepted from the Constitution. That ground is covered by the opinion of my Brother Carpenter. I think there is no doubt whatever that a railway, whether located upon the surface of highways and streets, or underneath

them, or over them, is an internal improvement within the meaning of the Constitution.

The case of *Sun Printing, etc., Ass'n* v. *Mayor, etc., of New York,* 152 N. Y. 257 (37 L. R. A. 788), is again cited in support of the respondents' contention. We expressly declined in *Attorney General* v. *Pingree,* supra, to follow the majority opinion in that case, and expressly approved the reasoning of the minority opinion. We are also cited to *Prince* v. *Crocker,* 166 Mass. 347 (32 L. R. A. 610), which involves the construction of the Boston subway. Whether the constitution of Massachusetts is similar to ours I have not examined to see, nor is it material. If it is based upon the reasoning of *Sun Printing, etc., Ass'n* v. *Mayor, etc., of New York,* for the same reason announced in *Attorney General* v. *Pingree* we should decline to follow it. I find it there stated:

"But railroads are always held to be built for public use, whether the right to take land, or the right to grant pecuniary aid to them is considered. The legislature of this commonwealth has granted aid to the railroad corporations from its own treasury. See instances cited in *Re Kingman,* 153 Mass. 570 (12 L. R. A. 417). It has also in a number of instances authorized cities and towns to furnish such aid by subscribing to stock or otherwise,"— citing many statutes.

This holding, if based upon a constitutional provision like ours, is in direct conflict with the case of *People* v. *Township Board of Salem,* supra, and other decisions by this court. The cases of *St. Louis* v. *Telegraph Co.,* 148 U. S. 92, 149 U. S. 465, and *Postal Telegraph Cable Co.* v. *Baltimore,* 156 U. S. 210, go no further than to hold that municipalities, when authorized by the State to permit the construction of telegraph lines, may charge a rental as a condition to the occupancy of the streets. They do not sanction the erection of the poles at the city's expense.

The judgment should be affirmed.

OSTRANDER, J. Section 169 of the charter of the city of Detroit reads as follows:

" The common council shall have power to make, grade, improve and adorn the public squares, spaces, grounds and parks belonging to or under the control of the corporation, and to control and regulate the same consistently with the purposes and objects thereof. It shall have power to establish, open, widen, extend, straighten, alter, vacate and abolish highways, streets, avenues, lanes, alleys and public grounds or spaces within said city; and to grade, pave, repair and otherwise improve the highways, streets, avenues, lanes, alleys or interior public spaces created by the intersection of streets, cross-walks and sidewalks in said city with stones, wood, brick or other material; and the common council shall have full power and authority to provide for the paying the costs and expenses thereof, by assessment in such manner as shall be prescribed by law, which assessment shall be a lien, until paid, on the lot, lots or premises, on which the same are bounded, and shall be collected in such manner as shall be authorized by law: *Provided*, That the costs and expenses of all repaving and repairing of streets, avenues and highways within the city shall be paid by the city out of the repairing fund created and raised for such purpose. The said common council may also provide for working and improving all highways, streets, avenues, lanes, alleys and public spaces within said city, and may assess and levy upon the taxable property within said city, and expend such highway taxes therefor as may be necessary, and may elect whether the same shall be collected in money or labor in such amount as the common council shall prescribe for each ward respectively: *Provided*, Such highway taxes shall not in amount exceed the rates now fixed by law, and the same shall be assessed, levied and collected as other taxes."

It is contended for the city that in this language, or in some of it, there may be and should be found an express grant of power to the council to build and maintain in the streets of the city street-railway tracks. I assume, and believe I am warranted in so doing, that the propriety and expediency of granting such power and the constitutional right of the legislature to grant such power are questions which have never been, in fact, presented for, and have never, in fact, had, legislative answer. If the legislature had in plain terms conferred such power, the law

would have been considered as marking a pronounced change of legislative policy, and could have been enacted only after extended debate and after exciting wide public interest. It is unreasonable to suppose that the legislature intended in the words employed to give to the common councils of cities having charters containing like provisions the power which the council of the city of Detroit now proposes to exercise. No form of argument can be advanced which will carry with it belief that the legislature, in fact, proposed to grant the power. This fact is not of itself conclusive. It is persuasive. It is persuasive where, as here, the exercise of power assumed marks a departure from long-continued and well-understood legislative and municipal policy, and is not clearly a mere extension or enlargement or the application and adaptation to new conditions of a power uniformly granted to cities and necessary to proper municipal administration. It is sufficient, in my opinion, to warrant and to constrain the court not to find, by a process of interpretation, that the fact is otherwise; not to find in the words " and otherwise improve" a power conferred which, in importance, equals any of those plainly expressed in the statute. The legislature is easily reached. If it were less doubtful that a particular grant had been attempted, the judicial power should, in prudence, hesitate in determining that the assumed power was conferred.

Let it be assumed that the question is one of construction, of interpretation, merely, and is whether the language used should be interpreted as expressly granting the disputed power. No one contends that it is an implied power. Discussion of the question can properly proceed only by keeping in mind certain propositions which, though elementary, will bear repeating. There is involved, for example, no question of expediency. All municipal powers rest in legislative grant. However desirable and proper it may be that certain powers should be possessed by the city of Detroit, if they have not been granted, they

cannot be exercised.    It is said in 1 Dillon on Municipal Corporations (4th Ed.), § 91, note, that—

"If upon the whole there be a fair, reasonable, substantial doubt whether the legislature intended to confer the authority in question, particularly if it refers to a matter extramunicipal or unusual in its nature, and the exercise of which will be attended with taxes, tolls, assessments, or burdens upon the inhabitants, or oppress them, or abridge natural or common rights, or divest them of their property, the doubt should be resolved in favor of the citizen and against the municipality."

Will any one say that the application of familiar rules of construction does not leave us doubtful of the legislative intention?

Counsel for the city, after reciting the history of the evolution of modern city ways, says:

"What we seek to do is to pave streets; that is all. And in paving those streets we propose to use just such material as in the judgment of the common council is adequate and proper and necessary to meet the growing demands of that great city.    And we propose to make, as a part of that pavement, two streaks of steel, or four streaks of steel, as the case may be, so that when it is constructed we will have a pavement with a solid foundation of adamant in the form of concrete.    It may be paved from the curb line to near the center with brick or asphalt, and then in the center of that street and as a part of that pavement we propose to lay steel rails, level with the balance of the pavement; and, when it is done, it is a street, constructed under the powers conferred by the Constitution of the State and the charter of the city of Detroit."

Mr. Justice Blair does not agree, in this respect, with counsel.    In his opinion the tracks should not be classed as pavement, but are to be considered as street improvements having for their object the preparation of the street for travel.    He finds the disputed grant of power in the words "otherwise improve," "with  *  *  *  other material," and determines that, so long as the proposed improvement is one which relates to preparation of the street for a recognized means of travel over and upon the street,

it is, within the rule of ejusdem generis, one of the species of improvements indicated by the words and purpose of tho charter provision.

It seems to me that both arguments fail to value a factor which is larger than any of those put in use in the statements and in the arguments. The street-railway tracks are not and are not intended as mere improvements of the ways. Taking into account all known conditions, it is idle to suppose that as mere improvements they would ever be laid. The power to lay railway tracks in streets would, if exercised, involve a relation of the city to the street which has never been considered as existing with respect to pavements or any other improvements — a relation which is, in this State, historically and legally considered, extramunicipal, certainly unusual in character. That relation and interest is in its nature proprietary and private. Either municipal operation of the vehicles which exclusively use the tracks or the leasing or renting of the tracks to private interests to be used in such operation is inevitable. The city proposes in the present instance to lease the tracks to a corporation. The relation of owner and of lessee is to be created. The contemplated improvement is not of the species described in the statute. It is not grading, paving, repairing, or otherwise improving, nor of the species indicated by those words, because involving, of necessity, consequences which could not follow upon the making of the specified improvements, nor any of like nature. The rule ejusdem generis is used as an aid in discovering legislative intention. Simply stated, the rule is that, when there are general words following particular and specific words, the former must be confined to things of the same kind. Lewis' Sutherland on Statutory Construction (2d Ed.), § 422. It yields to the rule that an act should be so construed as to carry out the object sought to be accomplished by it, so far as that object can be collected from the language employed. *Hawke* v. *Dunn*, L. R. 38 Q. B. Div. 579. It cannot be said that the particular words used in the charter exhaust

the genus.   It can be and should be held that the general words employed should not be given a meaning which involves necessarily consequences not embraced in the meaning of the specific words employed, and not following the exercise of the powers which the specific words of the statute confer.   This is only another way of saying that, if the construction sought to be placed upon the general words employed involves of necessity consequences not following the exercise of the powers granted in specific terms, proper ground may be found for the ruling that the construction attempted is not supported by the rule of ejusdem generis.

The building of tracks in a street is a method of preparation of a portion of the way for traveling by the use of street cars.   But, in considering whether the legislature, after using the specific terms "grade, pave, repair," intended in the use of the words "and otherwise improve" to confer upon the city the power to build such tracks, the consequences of the exercise of the power to build tracks should be considered in determining whether such a power belongs to the genus or species indicated by the specific words used.

There are other considerations.   The power to lay rails in streets may be exercised without reference to grading, paving or repairing.   It is an expensive preparation of a way for one means of travel, and does not involve, of necessity, its special preparation for any other means of travel.   We should expect, if such was the intention of the legislature, that the power to so improve, or so adapt the street to use, would be specific, and not concealed in the words "and otherwise improve."

Again, in arriving at the meaning of particular words used in a statute, it is frequently useful and is often conclusive of the question to survey the entire statute. If an asserted power is granted in a municipal charter, it is usual to find provision made for the exercise of such a power.   If it is doubtful whether such power is granted, and more doubtful whether means for its exercise have

been provided, the judicial mind will be thereby affected. An examination of the bill of complaint in this cause and of the charter of the city of Detroit strongly inclines the mind to resolve the manifest doubt against the existence of the asserted power. The charter (§ 233) provides that "the revenues and moneys of the corporation shall be divided into the following funds," naming, and specifying the purposes of, 15 separate and distinct funds, out of none of which, it is evident, money can be properly taken to build street-car tracks. It is further provided:

"*Sixteenth.* Such other funds as the common council may constitute for special purposes, not inconsistent with nor to be taken from any of the foregoing mentioned funds."

It is averred in the bill that the common council has caused to be levied and collected by a general tax on real and personal property the sum of $10,000 for a "street-car track construction fund," and has appropriated this sum, or so much thereof as may be necessary, to pay for building railway tracks. It may be said that by providing for the creation of other than the specified funds the legislature has in a legally sufficient way provided for means for exercising the asserted power. The point is, however, that it is not reasonably likely that either the grant of so important a power or the provisions for its exercise would have rested in such terms. Other consequences follow logically from the arguments advanced in support of the construction claimed.

Street-railway tracks will not alone aid travel. The theory that they are a method of street improvements for purposes of travel may be logically extended to embrace the proposition that under known conditions desirable and effective methods of using the rails requires an overhead or an underground equipment to supply necessary energy to propel vehicles upon the rails. In laying rails, the city will have proceeded a single step only in the method of improving the street for travel. If we may find in the charter the express power to lay the rails, why may and

should we not find, as well, the express or implied power to construct the other equipment of a modern street railway? It is said that this court has, in effect, determined the question which is presented in the case of *City of Detroit* v. *Railway*, 133 Mich. 608. But that case deals entirely with the question of the power to prepare a paved way in such manner that it will support an existing and proper means of travel. It is said in the opinion in that case that—

"The street-railway law does not in any way relieve the municipalities from the responsibility of maintaining the highways in a reasonably safe condition for public travel, and, as it cannot shift its liability to a railway company by contracting with it for the maintenance of the way, it would seem that it should be authorized, if it is not under a legal obligation, to repair the way when out of repair, whatever the cause."

The power, the exercise of which was in that case questioned, was the power to lay a pavement and to assess and collect the cost thereof, which should be adapted to a use to which the way had been properly put, to construct a proper pavement. The case is not authority for the conclusion that the city has been, in the words employed, granted the power to build street-railway tracks in its streets. Nor have the cases, *Prince* v. *Crocker*, 166 Mass. 347 (32 L. R. A. 610); *Sun Printing, etc., Ass'n* v. *Mayor, etc., of New York*, 152 N. Y. 257 (37 L. R. A. 788), any application here. In both of those cases the court considers legislation which in express terms empowers the municipal action which is questioned. On the other hand, there is to be found in the opinions of this court in *Schneider* v. *City of Detroit*, 72 Mich. 240 (2 L. R. A. 54), and in *Phelps* v. *City of Detroit*, 120 Mich. 447, 449, reasoning supporting the conclusion that the grant of the power in question here cannot be found in the charter.

I agree with Mr. Justice BLAIR that the laying of rails in the street is not paving, and that the rails are not

pavement. I do not find the power to build street-railway tracks contained in the power to otherwise improve the streets. Having reached this conclusion, I find it unnecessary, and think it inappropriate, to discuss or to express any opinion concerning the constitutional questions which have been raised. *Upton* v. *Kennedy*, 36 Mich. 215; *Powell* v. *Eldred*, 39 Mich. 552; Cooley on Constitutional Limitations (7th Ed.), p. 231.

I concede that, having found the power to build street-railway tracks conferred in the charter, it is proper and necessary to proceed to ascertain whether the legislature had constitutional authority to confer the power. But there can be properly no discussion of the constitutional authority to give the power without assuming that it is given. The contentions made by counsel for the city are, *first*, that in the language of the charter which has been quoted is found a grant of the power to do what the city has undertaken to do because what it has undertaken to do is road making; *second*, local municipal road making, highway improving, is not a work of internal improvement prohibited to the municipalities of the State by any provision of the Constitution. So long as it is not contended that the power is conferred unless it is in terms of "road making" if it is not found in those terms, it is not conferred.

The proposition that the legislature is prohibited by the Constitution from conferring upon cities the power to construct street railways is one which we are called upon neither to affirm nor to deny. To affirm it upon the ground that all works of local internal improvement forbidden to the State are likewise forbidden to cities, is, in my opinion, to find in the Constitution a new and heretofore unsuspected limitation upon the power of the legislature.

The decree of the court below should be affirmed.

BLAIR, J. The bill of complaint in this case is filed by the attorney general to restrain the defendants from ex-

pending moneys raised by taxation for the purpose of laying street-car tracks in certain streets of the city of Detroit.   The bill of complaint alleges:

"5. That the said common council has heretofore by resolution appropriated the sum of $10,000, known as the 'street-railway track construction fund,' to be expended under the direction of the said Jacob J. Haarer, commissioner of public works, in constructing a street-railway track, in certain streets in the said city of Detroit, for the purpose of leasing the same to the Detroit United Railway, a corporation now operating a street railway in said city or to some other corporation, copartnership, or individual, upon such terms as may be satisfactory to said common council, as will appear from the records of the proceedings of the said common council to which record reference is hereby made for greater accuracy.

"5a. That the board of estimates of the city of Detroit has heretofore authorized the levy of the said sum of $10,000, known as the 'street-car track construction fund,' upon the real and personal property of the taxpayers of Detroit, taxable under the laws of this State.   That the said tax levy has been duly laid by the proper authorities upon said property.   That the sum has been raised by the collection of said tax levy and has been placed in said street-car track construction fund to be paid upon the warrant of the said city controller upon the said city treasurer, all of which will appear from the records of the proceedings of the said board of estimates and of the board of assessors of the city of Detroit, and from the books of the said city controller, to all of which reference is hereby made for greater accuracy.

"6. That on the 31st day of October, 1905, the common council of the city of Detroit adopted the following resolution, viz.:

"'Resolved, That the commissioner of public works be and is hereby instructed to advertise for the period of five days in one or more of the newspapers published in the city of Detroit for sealed proposals to prepare the necessary plans and specifications for the Congress street car tracks upon and through Larned street east from the intersection of double section of Bates street, easterly to Elmwood avenue, thence along Elmwood avenue southerly to Jefferson avenue, thence a single track along Jefferson avenue on the south side of the double track already on said avenue easterly to Van Dyke, thence a single track along Van Dyke avenue to the city

limits, with all necessary switches for the same, and report the same to the common council at his earliest convenience, the said line to be constructed or as much thereof as the appropriation for the purposes will permit under the $10,000 appropriated and raised by taxation for the building of street-car tracks in conjunction with a franchise to be tendered to the Detroit Railway Company or its successors or assigns for the operation of street cars upon said line and upon its refusal of the same to be tendered to such other companies now organized or to be organized having power to operate street-railway cars, as may accept the same'—

"which resolution was duly approved by the mayor of said city of Detroit on November 7, 1905.

"7. That on the 31st day of October, 1905, the said common council of the city of Detroit unanimously adopted the following resolution, viz.:

"'*Whereas,* The grades of the intersection of the railroad and Greenwood avenue are being separated, making a roadway of a width of sixty feet, contemplating the building of a double track, street-railway track along said avenue, which this council hereby deems and declares under proper conditions to be hereinafter determined, to be advisable; and

"'*Whereas,* It would be better for many reasons, that the said track should be laid during the work connected with the separation of said grades now in progress; and

"'*Whereas,* Said tracks in the event of the construction of a double track along Greenwood avenue and out Hamilton Boulevard could be leased to any company that obtained said privilege; therefore, be it

"'*Resolved,* That the commissioner of public works be and is hereby instructed to cause to be laid a double track, girder grooved rails, of the most approved pattern in the center of the roadway at the said grade separation, the expense thereof to be taken from the $10,000 hereto appropriated for the construction of necessary street-railway tracks, loops and connections.'

"8. That the said common council does not have the power under the said Constitution and the laws of the State to authorize the expenditure of the funds of the city of Detroit in constructing a railway track upon any street in said city for the purpose of operating street cars thereon, either by leasing the same to others or by operating the same under the direction and control of the said city of Detroit, and that the expenditure of any money or funds of the said city of Detroit, from whatsoever funds

the same may be taken for the said purpose or purposes by the said common council, is illegal and void."

The defendants demurred to the bill of complaint, and the case was heard by all of the circuit judges sitting en banc. The judges dividing evenly as to the order which should be made, an order was entered overruling the demurrer; and, defendants declining to further plead or answer, it was decreed that an injunction issue in accordance with the prayer of the bill of complaint. From this decree, defendants have appealed to this court.

It is contended by complainant (1) that defendants have no power, express or implied, under the city charter, to make the proposed improvement; (2) that, if the charter attempts to grant such power, it is in violation of article 14, § 9, of the State Constitution.

It is said by one of the learned counsel for complainant that the question involved in this case is, in essence, "whether under the Constitution and the laws of the State, general and local, there may be municipal ownership of street railways." If by this is meant the ownership and operation of a complete street-railway system, we do not so understand the issue in this case and such construction was expressly disavowed by counsel for defendants. Neither do we understand defendants to claim any other or different ownership of the proposed railway track than that which it claims in the pavement of the street.

The question which we understand to be presented to us for our determination is, in essence: Can the city of Detroit lawfully improve its streets by constructing tracks therein so that such streets can be used by street cars? A section of the city charter (§ 169) confers upon the common council power to "establish, open, widen, extend, straighten, alter, vacate and abolish highways, streets, avenues, lanes, alleys, and public grounds or spaces within said city and *to grade, pave, repair and otherwise improve the highways, streets, avenues,*

*lanes, alleys* * * * *with stones, wood, brick or other material."*

In construing statutes, it is undoubtedly the general rule that, where general terms follow specific words of a like nature, they take their meaning from the latter; and complainant's counsel invoke this rule in support of the proposition that—

"From the words 'otherwise improve' no different intent can be discovered than from the words 'grade, pave and repair.' When these words were used, the legislature had in mind improvements of the same general nature as paving or repairing. * * * The rule ejusdem generis applies."

Conceding the application of this rule, it still must be determined whether the constructing of the track is within or without the genus. The rule itself implies that the other highway improvements may be different from the highway improvements specified so long as they fall fairly within the species of highway improvements of which specific instances are given. The improvements specified in the section under consideration relate to the preparation of the street for public travel and use, and, if the construction of the track is such an improvement, it falls within the species.

Is the construction of a street-railway track in the public streets a street improvement of the general character of which grading and paving are particular instances? In determining whether the construction of such tracks constitutes an improvement of the street for purposes of public travel, reference must be had to the legal nature of the use of the streets by street-railway companies. Chief Justice Cooley, in rendering the opinion of the court in *Macomber* v. *Nichols*, 34 Mich. 212, said:

"When the highway is not restricted in its dedication to some particular mode of use, it is open to all suitable methods; and it cannot be assumed that these will be the same from age to age, or that new means of making the way useful must be excluded merely because their intro-

148 Mich.—8.

duction may tend to the inconvenience or even to the injury of those who continue to use the road after the same manner as formerly. A highway established for the general benefit of passage and traffic must admit of new methods of use whenever it is found that the general benefit requires them, and, if the law should preclude the adaptation of the use to the new methods, it would defeat, in greater or less degree, the purpose for which highways are established. * * *

"It has justly been remarked by the supreme court of Illinois in a case involving the right to make use of steam as a means of locomotion in the public streets that—

" 'A street is made for the passage of persons and property, and the law cannot define what exclusive means of transportation and passage shall be used. * * * To say that a new mode of passage shall be banished from the streets, no matter how much the general good may require it, simply because the streets were not so used in the days of Blackstone, would hardly comport with the advancement and enlightenment of the present age.' *Moses* v. *Railroad Co.*, 21 Ill. 516, 523."

In *People* v. *Eaton*, 100 Mich. 208 (24 L. R. A. 721), the court said:

"Public highways are under legislative control. Cooley on Constitutional Limitations (6th Ed.), p. 725. They are for the use of the public in general, for passage and traffic, without distinction. The restrictions upon their use are only such as are calculated to secure to the general public the largest practicable benefit from the enjoyment of the easement. When the highway is not restricted in its dedication to some particular mode of use, it is open to all suitable methods. *Macomber* v. *Nichols*, 34 Mich. 212, 216. It has been settled in this State that lands taken or granted for public highways are so taken or granted for all the purposes for which they may be used for the benefit of the public, for the passing and repassing of travelers thereon, and for the transportation of passengers by stagecoach, omnibus, or street cars propelled by horses, steam, or electricity, and that the laying of tracks for such street cars is not an additional servitude upon the lands of adjacent proprietors. * * *

"When these lands were taken or granted for public highways, they were not taken or granted for such uses only as might then be expected to be made of them, by

the common methods of travel then known, or for the transmission of intelligence by the only methods then in use, but for such methods as the improvement of the country, or the discoveries of future times, might demand."

It necessarily follows from our decisions that the use of the highways by traction engines is a legitimate use, and that the duty is devolved upon the municipalities charged with their care to keep them in a reasonably safe condition for such use. *Aben* v. *Township of Ecorse,* 113 Mich. 9; *Randall* v. *Township of Southfield,* 116 Mich. 501.

In *Detroit City Ry.* v. *Mills,* 85 Mich. 634, Mr. Justice GRANT says in the course of his opinion:

"If some new motor (such as a storage battery, which counsel for the defendants in their brief say will no doubt be discovered in the immediate future) should be found to take the place of steam, and thereby dispense with the noise incident thereto, and the discomforts of dirt and smoke, would it be contended that railroad companies could not use it under the provisions of this law, because it was not known at the time the law was passed? These laws were enacted in times of rapid advancement in the mechanical arts. This advancement is nowhere more forcibly shown than in the discovery and use of devices and motors to facilitate travel and transportation. It cannot, in my judgment, be held that the legislature intended to limit these corporations to the use of things that were then known. This rule would be too rigid and technical to merit approval. The common law is more elastic and progressive. It adapts itself to meet the needs of the people, and the advance of science and civilization.

"As well might it be contended that, when land is dedicated to or condemned for the public use for highways, its use must be limited to the then known methods of travel and transportation. Engines now travel over nearly every public highway in the agricultural portion of the country, propelled by steam, drawing large machines, and stopping at nearly every farm to facilitate the work of the farmers, yet·upon this innovation of the use of the highway this same principle was invoked as is now invoked to prevent it. *Macomber* v. *Nichols,* 34 Mich. 212. * * *

" It is evident that street railways, when constructed so as not to interfere with the rights of others upon the street, form no obstruction to such use and enjoyment. They make no more noise than the omnibus or other heavy vehicles, are not more dangerous, and no more interfere with access to the abutting lots. They constitute a modern and improved use only of the street as a public way. These improved methods become necessary in populous cities. The use is the same. The methods only different. Without them, clerks and working men and women could not be provided with cheap and rapid transit from their working places to the suburbs of the city, where they may have cheap and comfortable homes. These views are in accord with the clear weight of authority. *People* v. *Kerr*, 27 N. Y. 188; *Kellinger* v. *Railroad Co.*, 50 N. Y. 206; *Mahady* v. *Railroad Co.*, 91 N. Y. 148; Pierce on American Railroad Law, p. 180; *Elliott* v. *Railroad Co.*, 32 Conn. 579; *Hinchman* v. *Railroad Co.*, 17 N. J. Eq. 75; *Attorney General* v. *Railroad Co.*, 125 Mass. 515; *Eichels* v. *Railway Co.*, 78 Ind. 261; *Hobart* v. *Railroad Co.*, 27 Wis. 194; *Brown* v. *Duplessis*, 14 La. Ann. 843; *Atchison St. R. Co.* v. *Missouri Pacific R. Co.*, 31 Kan. 660; *Smith* v. *Railroad*, 87 Tenn. 626; *Citizens' Coach Co.* v. *Railroad Co.*, 33 N. J. Eq. 267; *Briggs* v. *Railroad Co.*, 79 Me. 363; *Taggart* v. *Railway Co.*, 16 R. I. 668 (7 L. R. A. 205); *Clement* v. *City of Cincinnati*, 16 Wkly. Law Bul. 355; Cooley on Constitutional Limitations (6th Ed.), p. 683; 2 Dillon on Municipal Corporations (4th Ed.), § 722; Mills on Eminent Domain, § 205. They are also in accord with reason and common sense. It is the view unanimously adopted by this court in *Grand Rapids, etc., R. Co.* v. *Heisel*, 38 Mich. 62 (decided in 1878). It is true that this question was not directly involved in that suit, but the extent of the use of streets was involved. The question appears to have been carefully examined by the court, and the authorities are cited. While it may be termed ' dictum,' still it comes to us as the deliberate opinion of the learned justices who then constituted the court, and, as such, is entitled to great weight. That decision clearly voiced the practical construction which had theretofore been placed upon these laws by the people, and upon the faith of which many such roads had been built in many cities of the State, and vast sums of money invested."

In *Grand Rapids, etc., R. Co.* v. *Heisel,* 38 Mich. 62, the court said:

"If the railroad were only a city railway constituting a mere local convenience, and calculated to relieve the pressure of traffic and travel upon the street, the question, of course, would be different. There are cases which hold it to be competent under proper legislative authority to permit a street railway track to be laid, regardless of the consent or of the wishes of abutting proprietors who may own the soil of the street. A street railway for local purposes, so far from constituting a new burden, is supposed to be permitted because it constitutes a relief to the street. It is in furtherance of the purpose for which the street is established, and relieves the pressure of local business and local travel, instead of constituting an embarrassment. It is for this reason that the owners of lands over which a city street is laid are denied compensation if a street railway is subsequently authorized within it. If they were compensated for the taking of their land originally, they are supposed to be compensated for all possible losses they may suffer from its being put to proper uses as an avenue of local trade and passage, and, if without compensation they dedicated it to the public, they are supposed to have contemplated and assented to all such uses. They have, therefore, no ground for complaint when the new convenience is brought into use, and I apprehend one would not be permitted to show that in his particular case the street railway was an injury rather than a benefit. It is enough that the use of the street for a city railway is a proper use, and therefore a lawful use. Being such, it can give rights of action to no one. Such appear to be the conclusions of the courts.      *      *      *

"But we cannot say the same in the case of the ordinary railroad. It is not usual for such a road to be laid in one of the public highways, and the cases in which it is permitted are exceptional. For that reason, therefore, if for no other, the owner whose land is taken for a highway, whether in town or country, cannot be understood to have assented to its being appropriated, either wholly or in part, to railway purposes at the discretion of the public authorities, and to have been compensated for such appropriation. Neither can the use of the highway for the ordinary railway be in furtherance of the purpose for which the highway is established, and a relief to the local

business and travel upon it. The two uses, on the other hand, come seriously in conflict. The railroad constitutes a perpetual embarrassment to the ordinary use, which is greater or less in proportion to the business that is done upon it and the frequency of trains."

In *McKee* v. *Railway Co.*, 41 Mich. 274, Chief Justice CAMPBELL, speaking for the court, said:

" The law has in this State always provided some means of fixing rates of ferriage, and passage over turnpikes and bridges. It has also done the same on street and other tramroads. 1 Comp. Laws 1871, chap. 76. They cannot be distinguished in principle from turnpikes on which travelers use their own carriages, and ferries where means of carriage are furnished by the person or company owning them."

And again in *City of Detroit* v. *Railway Co.*, 76 Mich. 421, the same distinguished judge said:

" But these tracks are only special adaptations, for a particular use, of the surface of public highways."

In *Austin* v. *Railway*, 134 Mich. 149, it is said:

" We have held that a street railway is not an additional servitude, and the reason is that it is a provision made by public authority to facilitate public travel. It is the use of the highway, for the original purpose, by modified and changed vehicles and methods. If the public weal requires it, it is as much within the power of the public to lessen the grades for street cars as for wagons or automobiles."

See, also, *Smith* v. *Traction Co.*, 137 Mich. 20.

In *Ablard* v. *Railway*, 139 Mich. 248, it was said:

" It has been repeatedly held by this court that street-railway companies do not possess an exclusive right to that portion of the highway covered by their tracks, but that the ordinary traveler upon the highway has a right to use every portion of the highway, including the space between the rails, until it becomes necessary for him to yield the track to the cars of the company."

In *City of Detroit* v. *Railway*, 133 Mich. 608, the court said:

"It is claimed, however, that the city had not the authority to bind itself by such a contract, for the reason that the construction and use of a street railway requires a heavier and stronger foundation than is required in the other portions of the highway used by lighter vehicles. A street railway is a public utility. It is an appropriate and necessary method of using the highway, and the municipalities may permit them to occupy and use portions of the streets. Such occupancy is in common with that of the general public; all persons being at liberty to drive upon and over them where they are laid in the traveled portion of the street. The street-railway law does not in any way relieve the municipalities from the responsibility of maintaining the highways in a reasonably safe condition for public travel; and, as it cannot shift its liability to a railway company by contracting with it for the maintenance of the way, it would seem that it should be authorized, if it is not under a legal obligation, to repair the way when out of repair, whatever the cause. The right to assess the cost of pavement upon adjacent landowners is settled, and a wide discretion as to kind, solidity, and cost is left to the authorities. There can be no doubt that they may specify such a pavement as the present or prospective traffic of the street may require, and provide varying foundations according to circumstances. In all ordinary cases, the same are made adequate to sustain the vehicles that will traverse the streets. If street cars could be run without a fixed way of special construction, so that they could run upon any portion of the highway, the foundation of the entire roadway would need to be heavier and stronger, and in such case there would be no impediment to the construction of the same in the ordinary routine of building and repairing highways, unless it be the fact that the running of such cars might be a monopoly. Street railways are adapted to aid travel in the public highways, and, while the laws providing for their use impose upon private corporations the burden of constructing and operating them, all such laws contemplate that they will be constructed upon the highway. They presuppose a highway maintained by the public, and we are of the opinion that it is not beyond the authority of the public officers to build a highway that will support such traffic, even though it need a heavier pavement than ordinary traffic requires."

It follows from these decisions that a street railway (1)

is a proper, and, in a city of the size of Detroit, a necessary use of a public highway or street; (2) that such use is permissible " because it constitutes a relief of the street. It is in furtherance of the purpose for which the street is established, and relieves the pressure of local business and local travel instead of constituting an embarrassment;" (3) the tracks "are only special adaptations for a particular use of the surface of public highways;" (4) the city of Detroit has power to specially adapt a portion of a street for such special use by constructing a foundation for the track of special depth and strength; (5) the general powers granted by the legislature to the city of Detroit over its streets are not to be so construed as to limit their operation to street uses known or anticipated at the time of the grant, but rather so as to adapt them to the needs of the people and the advance of science and civilization.

These principles require, in my judgment, the conclusion that the construction of the street-railway track in question would be a street improvement of the general character of which grading and paving are specific instances. The pavement of a street in the usual way provides a floor over which vehicles generally may be drawn or propelled, but over which street cars cannot be propelled. The construction of a street-car track in a part of the street provides another form of floor over which street cars, and, subject to the right of way of such cars, vehicles generally may travel; such occupancy of the street being, as said in *City of Detroit* v. *Railway*, supra, "in common with that of the general public." While it may not be technically accurate to designate the track as a pavement, it does come within the species of street improvements having for their object the preparation of the street for travel and traffic, and therefore may lawfully be provided for under the charter. *Kirkland* v. *Board of Public Works of Indianapolis*, 142 Ind. 123; *Thompson* v. *City of Highland Park*, 187 Ill. 265. This conclusion appears to me to be strongly supported, if not required, by *City of Detroit* v. *Railway*, 133 Mich. 608.

It was held in that case and *City of Detroit* v. *Railway*, 134 Mich. 11, that the city might bind itself by contract to construct a concrete foundation or substructure upon which the railway ties should rest, differing from any other portion of the highway.

" The track of a railroad is not merely the rails and ties upon which cars are run, but it is the 'road, course, way' (Webster), and includes all that enters into and composes the road, the course and way. The embankment upon which the rails and ties are laid is a part of the whole that makes the railroad track." *Gates* v. *Railway Co.*, 82 Iowa, 518.

According to Webster, the roadbed of a railroad is "the bed or foundation on which the superstructure of a railroad rests;" and the superstructure is defined as "the sleepers, rails, and fastenings in distinction from the roadbed"—called also "permanent way." See, also, *City of Shreveport* v. *Railway Co.*, 107 La. 785.

The time when street-railway tracks could be constructed in the streets of a city like Detroit without a different roadbed from that adequate to other modes of transportation and traffic has long passed. A special foundation is required which shall meet the demands of enlarged and constantly expanding business and travel and withstand the enormously increased strains to which the substructure is subjected. The use of streets by street railways is a public street use, and if, for the purpose of furthering such use, the city may construct a substructure radically different from any other portion of the street and wholly unnecessary for any but the special use to which it is to be put, I do not perceive any valid reason why it may not also construct the superstructure resting upon such substructure. The power, which we have held that the city possesses, to construct part of the track, in my judgment, carries with it the power to construct the whole track.

But it is contended that, even if the charter confers power upon the city to construct the track for general

public use, it confers no power to lease the track when constructed to a private corporation or individual as contemplated by the ordinance. The term "lease" is not, perhaps, the best that could have been used, but I do not think it should be construed as meaning that any proprietary interest in the public streets was to be conferred upon the lessee, nor that the occupancy should not be subject to proper legislative control. Leaving out of consideration the constitutional question raised by complainants, I think this contention is unsound. In *Prince* v. *Crocker*, 166 Mass. 347 (32 L. R. A. 610), the statute authorizing the construction of the Boston subway was attacked as unconstitutional, amongst other grounds, for the reason that the taxation to provide for it was not for a public use. The statute provided that, when finished, the transit commission might grant a lease of it to any street-railway company for 50 years. It was held:

" The building of the subway for the carriage of such passengers as pay the regular fare is therefore for a public use, and it is within the constitutional power of the legislature to order or sanction taxation for it."

In *Sun Printing, etc., Ass'n* v. *Mayor, etc., of New York*, 152 N. Y. 257 (37 L. R. A. 788), the New York rapid transit acts were under consideration. Those acts created a rapid transit commission and provided for the location by the commission of a route and the plans and specifications for a railway through the city. After locating the route and providing the plans, they were authorized to sell at public auction the right, privilege, and franchise to construct, maintain, and operate such railway; or, if the people so voted, to contract for the construction of the proposed railway at the expense of the city. In case the road was constructed at the expense of the city, the commissioners were authorized to lease the same for a period of not less than 35 nor more than 50 years. It was held that railroads, being necessary for the common welfare of the people, required for their use, and public in character, are for "a city purpose" within the meaning

of the constitutional provision which prohibits cities from incurring any indebtedness except for a city purpose, when authorized by the legislature and constructed and owned by the city in whose territory they are located. See, also, *St. Louis* v. *Telegraph Co.*, 149 U. S. 465; *Postal Telegraph Cable Co.* v. *Baltimore*, 156 U. S. 210. I do not think the applicability of these cases is affected by the fact that in each of them there was an enabling act conferring in express terms authority to do the precise things attempted. If, as must be taken for granted in considering this question, the charter confers the power to construct the track, such grant of power must, by necessary implication, carry with it authority to make the track available when constructed. If, as contended by complainant's counsel and substantially admitted by defendant's counsel, the city could not operate the line itself, we should have the anomalous situation of a city authorized to construct tracks for public travel, but without authority to provide for such travel. It is not a sufficient answer, in my opinion, to say that any persons possessing the appropriate vehicles could use the track, since the indiscriminate use of the track would bring about such confusion as to defeat the very purpose of its construction.

It may also be urged that the laying of the rails is not for a street purpose because they are not susceptible of common use as a pavement and the usual improvements are. I think this argument is fallacious. Not only is the argument against the spirit, if not the letter, of our own decisions, but it has no foundation in fact. While vehicles with ordinary wheels are not adapted to traveling on the rails, the street, by virtue of these rails, is relieved of many vehicles which otherwise would be obstructing the use of the street and congesting traffic. Instead of embarrassing the common use of the street, they facilitate such common use.

It remains to consider the constitutional objection that the contemplated improvement would violate section 9 of article 14 of the Constitution, which provides:

"The State shall not be a party to, nor interested in, any work of internal improvement, nor engaged in carrying on any such work, except in the improvement or aiding in the improvement of the public wagon roads and in the expenditure of grants to the State of land or other property."

This question was presented to the court by counsel in the case of *Attorney General* v. *Pingree*, 120 Mich. 550 (46 L. R. A. 407), but the court declined to pass upon it, saying:

"It is not necessary to pass upon the question just stated in order to dispose of this case. The law under consideration involves much more than the simple question of municipal ownership of the tracks within the corporate limits, and, in the decision of the case before us, we do not deem it wise to express any opinion upon any question other than the one before us."

The question must therefore be regarded as open for consideration. That the improvement contemplated constitutes an internal improvement is conceded by counsel for the city, but he contends that it is a local internal improvement such as is not prohibited by the section above quoted, but, on the contrary, is authorized by other sections of the Constitution—citing section 38, art. 4; section 11, art. 10; section 1, art. 11. I think it clear that the proposed improvement is an "internal improvement." *People, ex rel. Hubbard,* v. *Township Board of Springwells,* 25 Mich. 153. But the determination that the work is an internal improvement does not determine that it falls within the ban of the constitutional prohibition against such improvements. It was held in the case last cited:

"That a macadamized road is a 'work of internal improvement' is manifest. The shortness of the road does not change its character. The restriction is not against great works, but against all works of that kind, and the case comes within the language and intent of the prohibition."

The case came "within the language and intent of the

prohibition," because a purely local work was committed to State agents and taken out of the hands of the local officers, to whom alone the custody of the highway belonged. No one, I think, would argue that a township or city could not lawfully be authorized to construct a macadamized road. Such a conclusion would prevent the improvement of highways .and streets entirely. It is a necessary implication of the opinion of the court in the *Springwells Case* that the township authorities had the power to construct a macadamized road, and were the only persons who did have that power, for the reason that such work was "a purely local work." The court say on this subject:

"The overseer of this highway district is excluded from all his functions, and so are all others who should have any voice in the matter. The result is that a purely local work, public in its character, is taken charge of and conducted at local expense, and paid for by local bonds and taxes, without giving any of the local authorities any function to perform, except that of yielding implicit obedience to the orders and requisitions of a commission, in whose appointment and government the town · and its people have had no part whatever.

"This is a very clear usurpation, and, so far as it goes, an absolute destruction of the local privileges. There is no principle which can justify such an interference, which would not equally justify the assumption by the State, of immediate control by its agencies of every highway in the Commonwealth, and the imposition of local taxes for local purposes, to be levied and.expended by persons neither residing in, nor in any way connected with, or responsible to, the towns on which they levy their charges."

The improvement of a street for authorized street purposes within the local jurisdiction, like the construction of sewers, lighting, and water plants, is a local internal improvement committed by the Constitution and statutes to the local government. It is only when in a proposed internal improvement the local government is really acting as the agent of the State government, or engaged in an enterprise which extends beyond the limits of the

municipality, in evasion of the constitutional prohibition, and not in the discharge of its local functions, that such improvement is prohibited.   It is no answer, in my judgment, to say that certain of the improvements above mentioned are justified as an exercise of the police power. The police power cannot be exercised in contravention of an express prohibition of the Constitution.   It, like all other governmental powers, is subject to the Constitution.

If I am correct in my conclusion as to the power of the city under its charter to construct the track, because such construction is of the same character of improvements as grading and paving, it seems to me to necessarily follow that it is of the same character, as an internal improvement, as grading and paving, and therefore not affected by the constitutional prohibition.   I think, also, that, conceding the first point to be correctly determined, the second point, now under consideration, is ruled against complainant's contention by *City of Detroit* v. *Railway*, 133 Mich. 608.   The constitutional prohibition was invoked in that case.   In disposing of the question, the court say:

"We are also of the opinion that it cannot be said that the city engages in a work of internal improvement by making a contract whereby it shall construct and repair its highways and pavements, instead of allowing the railway company to interfere with them."

This case was followed in *City of Detroit* v. *Railway*, 134 Mich. 11, where was involved the right of the defendant company to demand compensation for concrete placed under the ties, under the following ordinance:

"In all unpaved streets wherein the grantees are duly authorized by the common council to construct street-railway tracks under the provisions of this ordinance, the preparation of the roadbed shall be made by the grantees, their successors or assigns, the excavation to extend seven inches below the under side of the cross-ties upon which the tracks are laid; but the six inches of concrete required by the ordinance as foundation for the ties to rest upon shall be laid by and at the expense of the city at the time

of the construction of the tracks; the city not being required, however, to do the paving between the tracks until the street is paved. The common council may, however, in its discretion, order the paving of the tracks on unpaved streets to be done at city expense contemporaneously with the first construction of said tracks."

In determining the question, this court said:

"The important question in the case is as to the right of the defendant to demand compensation for concrete placed under the ties in laying the tracks of the road in unpaved streets. That it was the duty of the city, under the ordinance, to put down this concrete, is clear; but it is contended that this provision of the ordinance was ultra vires. This contention is answered by the mandamus case between these same parties, decided at the present term. 133 Mich. 608."

In my opinion, these cases, and not the case of *Attorney General* v. *Pingree*, rule the case now before us. As well said by Judge Murphy in his opinion in the circuit court:

"In the last-mentioned case (134 Mich. 11), the city was required, because of its contract with the railway company, to build the concrete substructure for steel rails and ties in streets which were not only unpaved, but which may forever remain unpaved. The sole function of that foundation was to furnish a roadbed for the rails. In other words, the city, not under any claim of paving the street, was permitted to construct a portion of the equipment of a railway and assess the cost thereof upon the taxpayers. If there is constitutional warrant for this— and it is expressly decided that there is—why may not the city construct the roadbed in its entirety, as well as in part? There is no distinction in the principle involved."

The foregoing is an elaboration, after rehearing, of my original opinion written and served in September, 1906. The recent opinions of Justices CARPENTER and GRANT seem to warrant some further discussion of the questions involved. It is said: "*Second.* The constitutional provision in question, except as otherwise provided in the Constitution, prohibits municipalities as well as the State

at large from engaging in works of internal improvement;" citing *People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich. 499.; *Thomas* v. *City of Port Huron,* 27 Mich. 320; *Anderson* v. *Hill,* 54 Mich. 477; *Attorney General* v. *Pingree,* 120 Mich. 550 (46 L. R. A. 407). And again:

"To be effectual the constitutional prohibition—and it was intended to be effectual and must be so construed—applies to every part of the State, and to me it seems absurd to suppose that the people intended to permit a part of the State to do what the whole State could not do."

This absurdity has met with the approval of the Supreme Court of the United States. In *Township of Pine Grove* v. *Talcott,* 19 Wall. (U. S.) 666, the Federal Supreme Court said, relative to this constitutional provision:

"The case as to the Constitution is a proper one for the application of the maxim, 'Expressio unius est exclusio alterius.' The instrument is drawn with ability, care, and fullness of detail. If those who framed it had intended to forbid the granting of such aid by the municipal corporations of the State, as well as by the State itself, it cannot be that they would not have explicitly said so. It is not to be supposed that such a gap was left in their work from oversight or inadvertence. * * *

"It is insisted that the invalidity of the statute has been determined by two judgments of the Supreme Court of Michigan, and that we are bound to follow those adjudications. *People* v. *Township Board of Salem,* 20 Mich. 452; *People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich. 499. We have examined those cases with care. With all respect for the eminent tribunal by which the judgments were pronounced, we must be permitted to say that they are not satisfactory to our minds."

See, also, *Taylor* v. *Ypsilanti,* 105 U. S. 60. I refer to these cases, and numerous others might be cited, not for the purpose of arguing that the Michigan cases should be overruled, but for the purpose of supporting my contention that the application of those cases should not be extended to purely local improvements, which, in my judgment, are not necessarily embraced within their scope.

In the case of *People, ex rel. Bay City,* v. *State Treasurer,* the bonds were issued in aid of the Jackson, Lansing & Saginaw Railroad Company, extending through many counties. The court said:

"Decisions in other States were found which were supposed to sanction the doctrine that, under such circumstances, the State might do indirectly through its subdivisions what directly it was forbidden to do. Thus a way was opened by which the whole purpose of the constitutional provisions quoted might be defeated. The State could not aid a private corporation with its credit, *but it might require each of its townships, cities, and villages to do so.* The State could not load down its people with taxes for the construction of a public improvement, but *it might compel the municipal authorities, which were its mere creatures, and which held their whole authority* and their whole life at its will, to enforce such taxes, one by one, until the whole people were bent to the burden.

"Now, whatever might be the just and proper construction of similar provisions in the Constitutions of States whose history has not been the same with our own, the majority of this court thought when the previous case was before us, and they still think, that these provisions in our Constitution do preclude the State from loaning the public credit to private corporations, and from imposing taxation upon its citizens or any portion thereof in aid of the construction of railroads."

In *People, ex rel. Hubbard,* v. *Township Board of Springwells,* 25 Mich. 153, the work was held to be State work because carried on by State agents.

In *Thomas* v. *City of Port Huron* the bond was given to aid in the construction of a railroad from Port Huron to a point in Shiawassee county.

In *Anderson* v. *Hill* the court say:

"In this case the improvement of the Dowagiac river was undertaken by the State, under the law of 1859 and its amendments, and the contract, therefore, so far as appears upon its face, was legitimate and valid. But suppose the contract with West had contained a stipulation that $2,500, in addition to the compensation he was to re-

ceive from the appropriation of swamp lands, should be paid to him by a tax levied upon the taxable property of the township of Decatur, under the provisions of Act No. 323 [Local Acts 1881], the illegality of the contract would have been apparent. The contract would have shown, upon its face, that the State had engaged in a work of public improvement, to be paid for in part in some other mode than the expenditure of grants of land to the State. The Constitution cannot be evaded by making a contract apparently valid, and by special enactment providing for a portion of the expenditure to be raised by taxation and expended in the work under the supervision of State agencies."

In *Sparrow* v. *Commissioner of State Land Office*, 56 Mich. 567, the majority of the court held the act for straightening, etc., Cedar river to be valid, in so far as it provided for an appropriation of swamp lands. Justice CAMPBELL held the act to be invalid because of the provisions for taxation of the localities benefited. He says, in the course of his opinion:

"There is no duty laid on any one except as ancillary to the action of the State agent. The case is in this respect stronger than that of *People, ex rel. Hubbard*, v. *Township Board of Springwells*, where there were some subordinate functions performed by town officers, and that of *Anderson* v. *Hill*, where the tax was left optional with the voters of the townships concerned. Here neither township nor county authorities, nor people, in any known, direct, or representative way, have any control in the matter."

Not one of these cases is inconsistent with the grant by the legislature of authority to a local municipality to execute and pay for works of local internal improvement, and such grant is authorized by other sections of the Constitution.

It is said in *Attorney General* v. *Pingree:*

"That, by sections 23 and 38 of article 4, and section 1 of article 11, the Constitution has given to townships the *control* of highways, and to the cities and villages the *control* of the streets *for all purposes germane to their use.*"

I have endeavored to show that the proposed improvement in this case is germane to the use of the highway. The *Pingree Case* involved the power to acquire and operate railways outside the city limits in territory over which the city had no jurisdiction. The statute, therefore, had a State aspect as well as a local aspect, and might well be held to fall within the ban of the constitutional provision. But the court solemnly disavowed passing upon the question now before us. That question was left open, as it has been by every prior decision. The Constitution clearly prohibits the State being a party to or interested or engaged in any internal improvement, and it is not illogical to hold that what is prohibited to the State directly it cannot do indirectly through any of its governmental agencies. There is, however, no constitutional prohibition of a municipality engaging in local internal improvements which the State is neither a party to nor interested in, nor engaged in carrying on. Conceding the correctness of our previous decisions and that the courts who have refused to follow those decisions have gone astray, a decision that this case is ruled by them goes a long step beyond them, and, in my judgment, practically reads into the State Constitution a prohibition of local improvements which its framers never put there, and, in my opinion, never intended to put there.

It is said, however, that if there is any ground for this distinction, "it must be found in the Constitution. If a prohibitory constitutional provision, general in its character, is subject to exceptions, those exceptions must be found in the Constitution." And:

"Municipalities could construct and maintain roads for public travel * * * because other provisions of the Constitution (article 11, § 1. See, also, article 4, § 49; article 10, § 11) by necessary implication granted municipalities authority to construct and maintain such roads. * * * It is entirely consistent to say that though municipalities were prohibited by the Constitution from engaging in works of internal improvement, they might nevertheless construct and maintain roads, which are

works of internal improvement, because the Constitution empowered them to do so."

There is no constitutional provision against municipalities engaging in internal improvements when not acting as agents of and for the State, and this court has never, in my opinion, held that there is. The city of Detroit is not authorized to construct streets because of a grant of power contained in the Constitution, but because there is no limitation of that power contained in the Constitution, and, if I am correct in my interpretation of the charter, the legislature has granted the power in accordance with article 4, § 38, of the Constitution.

"The Constitution is not a grant of power, but a limitation upon its exercise by the agents of the people who compose the legislative branch of the government." *Attorney General* v. *Preston*, 56 Mich. 177.

And the—

"Legislature of Michigan possesses all legislative power to the full extent that like power is possessed by the Parliament except as State and Federal Constitutions have limited it." Opinion of Chief Justice COOLEY, *State Tax Law Cases*, 54 Mich. 389.

Our inquiry, therefore, should be whether the otherwise plenary power of the legislature to grant to the municipalities authority to make local internal improvements is limited by some constitutional provision, mindful of the repeated declarations of this court that a statute is not unconstitutional unless in plain violation of such provision, and its constitutionality will be supported by all possible presumptions not clearly inconsistent with the language and subject-matter. I find no warrant in the Constitution for the contention that power has been granted thereby to municipalities to construct roads, and that, therefore, they are excepted by implication from the internal improvement provision. No such constitutional provision was necessary, since without it, in the absence of some restraining provision, the legislature would have that power. Article 11, § 1, provides:

" There shall be elected annually   *   *   *   in each organized township   *   *   *   one commissioner of highways   *   *   *   and one overseer of highways for each highway district, whose powers and duties shall be prescribed by law."

Article 4, § 49, provides:

" The legislature may provide for the laying out, construction and maintenance of county and township roads," etc.

Article 10, § 11, provides:

" The board of supervisors of each organized county may provide for laying out highways, constructing bridges and organizing townships, under such restrictions and limitations as shall be prescribed by law."

Article 11, § 1, does not pretend to confer upon cities the power to construct or control highways. It does limit the power of the legislature to do away with highway commissioners and overseers of highways in townships or to entirely abolish their functions. And by the constitutional amendment of 1899 (section 49, art. 4) this restriction was removed. *Campau* v. *Highway Com'r of Grosse Pointe*, 132 Mich. 366. The other two sections are expressly limited to township and county roads and by their terms are not applicable to city streets.

The only inference, in my judgment, which can properly be drawn from these provisions, so far as cities are concerned, is that the construction and control of highways were regarded as matters of local, and not of State, concern. The dissenting opinion of Justice MOORE in *Moreland* v. *Millen*, 126 Mich. 399 (which I suppose to be referred to), appears to me to support my conclusion. It is there said:

" It has been held that, because the care of the highways is a local matter, their custody in the townships cannot be taken from the local officers. *People, ex rel. Hubbard,* v. *Township Board of Springwells*, 25 Mich. 153; *Davies* v. *Board of Sup'rs of Saginaw Co.*, 89 Mich. 295. The same rule is applicable to cities."

In *Township of Grosse Pointe* v. *Finn*, 134 Mich. 529, the same judge, delivering the opinion of the court and citing several cases, among them *Moreland* v. *Millen*, said:

" These cases undoubtedly hold that in relation to local affairs the legislature may not withhold authority from the local authorities and confer it upon an outside agency."

Nowhere has the Constitution granted to cities, either expressly or by necessary implication, authority to construct or maintain highways. It was unnecessary to make such grant. They possess the power, if they possess it at all, because the Constitution nowhere prohibits its exercise and the legislature has granted it. The right is not an exception to the provision against internal improvements, but is not embraced therein because its exercise is limited to the territory of the city, and is of local concern. The only clause of the Constitution from which a grant of power can be inferred is section 38 of article 4, and this, I think, must have been Mr. Justice MOORE's opinion, as shown by the language quoted in the *Pingree Case*, and was the reason why he held that the question now before the court was not involved in that case.

The construction of a macadamized road by a city must stand or fall upon the same grounds as every other city internal improvement. The legislature might not grant to a city authority to construct a macadamized road lying partly within and partly without its territory, because in such case the State is attempting to do indirectly, through its governmental agent, what it could not do directly itself. *Attorney General* v. *Pingree*, supra. The State could not direct the construction of such road entirely within the city limits by State officers because the State was prohibited from engaging in such works anywhere. *People, ex rel. Hubbard,* v. *Township Board of Springwells,* supra. The legislature could authorize the construction of a macadam road by the city, for the city, and entirely within its territory, just as it could construct any other

city internal improvement, because, as said by this court, it "is a local matter."

I must confess that I am unable to discover the legal basis for the doctrine, which seems to be asserted, that municipalities can construct such a local internal improvement as a water plant as an exercise of the police power, in the teeth of a constitutional provision prohibiting municipalities from constructing any internal improvement. Can it be seriously contended that, if the constitutional provision in terms provided that no municipality should construct a water plant, the city would be authorized to construct such plant under its police power, or that the legislature could grant such power? It appears to me that they all stand upon the same ground. If the city can be empowered to construct one, it can construct all. If it cannot be empowered to construct one, it can be empowered to construct none. The proposed improvement is not prohibited by the constitutional prohibition in question because it is a local improvement, which section 38 of article 4 authorized the legislature to permit. To hold otherwise is, to my mind, to amend the Constitution by strained judicial interpretation. In conclusion, I quote the language of Chief Justice COOLEY in *State Tax Law Cases*, 54 Mich. 350 :

" In cases heretofore presented for our examination we have indicated certain rules of propriety and caution which should be observed by us when thus invited to declare void the action of a co-ordinate department of the government, and to those rules we should be inexcusable if we did not strictly adhere. One of these is that we must enter upon an examination of a constitutional question like this assuming that the legislature has been guilty of no usurpation. We are to remember, also, that we have no supervisory power in respect to legislation; that the lawmaking power is not responsible to the judiciary for the wisdom of its acts; and that, however unwise or impolitic their acts may appear, they must stand as law unless the legislature has plainly overstepped its constitutional authority, or lost jurisdiction in the attempt to exercise it, by failing to observe some express constitutional

direction. And the case must be clear. A mere doubt on our part of the validity of what the lawmaking department of the government has undertaken to enact is no ground for annulling it. These are commonplaces in constitutional law. They have often been declared by us, and still more often by other courts. There is reason to believe, however, that the rules are more often laid down than observed. When a court declares an enactment invalid, its judgment is in general conclusive. The legislature cannot appeal against it, and the public is likely to accept what is adjudged as probably correct, and to acquiesce without questioning it. Under such circumstances, it is to be feared that courts sometimes, without perhaps being conscious of the fact, proceed in the examination of questions concerning the constitutionality of legislation as if they were at liberty to consider the questions as questions of policy merely, and to dispose of them according to the view they should take of the wisdom of the legislation. There is ground for the belief that sometimes statutes have been annulled by courts on objections that purported to be grounded in the Constitution, but which, if plainly stated, would resolve themselves into this: That the judges did not like the legislation. But every such case is mischievous in its tendency, for it shows that courts lay down proper rules for the government of their own conduct and then fail to observe them. It is not less important that a court should keep carefully within its proper jurisdiction than that the legislature should observe the limits set by the Constitution to its powers; for the spectacle of a court imputing usurpation to the legislature when in the very act the court itself is chargeable with a like disregard of duty is neither edifying nor wholesome."

In my opinion, the decree should be reversed, and the bill of complaint dismissed, with costs of both courts to defendant.

MONTGOMERY and MOORE, JJ., concurred with BLAIR, J.